1       IN THE UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF NORTH CAROLINA

3   INTERNATIONAL LABOR MANAGEMENT      )
    CORPORATION,                        ) Case No. 14CV231
4                                       ) Greensboro, North Carolina
        Plaintiff,                      )
5                                       ) April 7, 2014
        vs.                             ) 2:23 p.m.
6                                       )
    THOMAS E. PEREZ, IN HIS OFFICIAL    )
7   CAPACITY AS UNITED STATES SECRETARY )
    OF LABOR and UNITED STATES          )
8   DEPARTMENT OF LABOR,                )
                                        )
9       Defendant.                      )
    _____)

10

11

12              TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
13                UNITED STATES DISTRICT JUDGE

    APPEARANCES:
14

15  FOR PLAINTIFFS:

16      WILLIAM RANDOLPH LOFTIS , JR.
        CONSTANGY BROOKS & SMITH, LLP
17      100 N. CHERRY ST., STE. 300
        WINSTON-SALEM, NC 27101

18      ANN MARGARET POINTER
        FISHER & PHILLIPS, LLP
19      1075 PEACHTREE ST., N.E., STE. 3500
        ATLANTA, GA 30309

20      ROBIN E. SHEA
21      CONSTANGY BROOKS & SMITH, LLP
        100 N. CHERRY ST., STE. 300
22      WINSTON-SALEM, NC 27101

23      JAMES MICHAEL HONEYCUTT
        FISHER & PHILLIPS, LLP
24      POB 36775
        CHARLOTTE, NC 28236

25

1  APPEARANCES, Continued:

2  FOR DEFENDANTS:

3        GEOFFREY FORNEY
          U. S. DEPARTMENT OF JUSTICE
4        CIVIL DIVISION
          450 FIFTH ST., NW
5        WASHINGTON, DC 20001

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  Court Reporter:        Joseph B. Armstrong, RMR, FCRR
                            324 W. Market, Room 101
23                          Greensboro, NC  27401

24              Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.

25

<u>P R O C E E D I N G S</u>

1          (At 2:32 p.m., proceedings commenced.)

2          THE COURT:  All right.  Let's move on to the next

3 case set for this afternoon, which is International Labor

4 Management versus Perez, et al.  It's here on a motion for TRO

5 and preliminary injunction.

6          MS. POINTER:  Your Honor, if I may, I would like to

7 give you all a stack of papers, all of which are part of the

8 record or various congressional reports or other documents that

9 we've talked about because we've put so much paper in the

10 record it might help to have copies of them as we flip through.

11          THE COURT:  All right.

12          MS. POINTER:  So, ma'am, here is one, here is a set,

13 and here is an extra set.

14          (At 2:36 p.m., break taken.)

15          (At 2:43 p.m., break concluded.)

16          THE COURT:  All right.  As I indicated, we are here

17 in International Labor Management versus Perez, 14CV231.  For

18 purposes of the record, I'll start with the plaintiff's side of

19 the table, just tell me who is here.  Mr. Loftis, if you'd like

20 to start, you can.

21          MR. LOFTIS:  Ms. Pointer is going to do the argument.

22          THE COURT:  All right.

23          MR. HONEYCUTT:  Mike Honeycutt from Charlotte.

24          THE COURT:  All right.  Ms. Pointer?

1    MS. POINTER:  Yes, Your Honor, and Margaret Pointer.

2    MS. SHEA:  And Robin Shea, Your Honor.

3    THE COURT:  All right.  Mr. Forney?

4    MR. FORNEY:  Thank you, Your Honor.  Good to see you

5 again.  Geoffrey Forney, United States Department of Justice,

6 for federal defendants.

7    THE COURT:  All right.  Thank you, sir.  All right.

8 It's the plaintiff's motion for a preliminary injunction -- TRO

9 and asking for also an order of mandamus.  So, Ms. Pointer, if

10 you'd like to proceed, you may do so.

11    MS. POINTER:  Thank you, Your Honor.  Thank you for

12 your patience as I'm trying to lay out our documents, or at

13 least enough of our documents so that we can walk through the

14 process that our client has found itself in on behalf of itself

15 and its clients, and thank you for your time considering this

16 important issue for the client, which is an agent for farmers

17 and other businesses around the country in the temporary

18 agricultural labor program.  Employers have to reply every

19 year.  Of course, everything is time sensitive, whether it's a

20 farmer trying to get plants in the ground or clip his plants

21 long enough to keep them healthy so he can plant them and have

22 them live and survive, or whether it's a resort in Wyoming that

23 needs to have staff to open up this summer.

24    I thought what I would do to try to help focus on how

25 important these timelines are that Congress put in originally

in the 1986 act and then strengthened again, frankly favoring
employers, in 1999. So the first document in your stack is a
copy of the Code as it was before the amendment in 1999, and in
the United States Code at page 128 under Title 8 USC 1188, you
can see that when the Immigration Reform and Control Act was
first passed in 1986, there was the 60-day limit that the
Department of Labor could impose for filing an application.
Farmers didn't like it. It required them to make commitments
in terms of their hiring decisions too early. That was a big
issue after IRCA was passed, and so in 1999 it was changed by
Congress.

The other thing that was increasingly a problem
because the immigration program had expanded is that 20 days in
advance of need, meaning the day the farmer or other employer
expected to have the worker on the premises and working, was
just not long enough to go through the USCIS. Of course, it
was called INS -- INA. It was part of the --

THE COURT: Let me ask you a question. Why didn't
they do the same thing for the H-2B program?

MS. POINTER: The reason I think that's important is
that in 1986 when IRCA was passed, almost nobody used what is
now known as the H-2B program. There were very few
nonagricultural workers who came to the US to do resort work,
shrimp and craw fish processing, and that sort of thing. It
had not risen to be a pressing need.

1          I read recently that all but about 15 percent of the
2    United States population now lives in one of the so-called
3    standard statistical areas, and so that means that they're huge
4    swaths of the country in rural areas and in areas around the
5    coast where they need to have workers for these short-term
6    temporary jobs.  They can't afford to have resorts open all
7    year.  You can't do certain shrimping and other work all year
8    long.  And so over the years since 1986, the use of the H-2B
9    program has become an increasingly critical part of a lot of
10   seasonal operations work force.

11          As a matter of fact, because of the delay, the
12   failure by the Department of Labor to honor its regulatory
13   commitment, which, as you know, under the *United States v.*
14   *Heffner* and other doctrinal cases say whether it's a statute or
15   regulation you voluntarily undertake, Mr. Secretary, you are
16   obliged to follow the rules you said you're going to follow.

17          THE COURT:  The H-2A program has application not more
18   than 45 days, response within 7 days, and then the certificate
19   not less than 30 days prior to the date of need.  But on the
20   other hand, looking at the statutes, which there's very little
21   looking at the regs, and the H-2B, all I could find in terms of
22   timing was an RFI is to be responded to within 7 days, but
23   there's no -- I don't see any timing component to that, and it
24   looks like in a manner of regulation that the time frames
25   considered under H-2B are much longer.  I think I saw some

1   advertisements and some other information that goes back as far

2   as 150 days.  So at least from a statutory standpoint, the H-2A

3   and H-2B program are very different, aren't they?

4          MS. POINTER:  But -- there's just not as much

5   statutory language, but let me point Your Honor to --

6          THE COURT:  What does that exactly mean?

7          MS. POINTER:  Sir?

8          THE COURT:  There's just not as much statutory

9   language?  So what's the regulatory language you would point to

10  to set those timetables in the H-2B program?

11         MS. POINTER:  And that's exactly what I'm going to

12  say, Your Honor.  If you go to -- as a matter of fact, I have

13  it in the stack --

14         THE COURT:  Just tell me where to go.

15         MS. POINTER:  If you look at the HeinOnline citation,

16  it's the CFR.  It's reference to the page 468, 1912.

17         THE COURT:  What number are you looking at?  20 CFR?

18         MS. POINTER:  20 CFR.  It's a -- I'm sorry, 2012

19  edition of the CFR, 20, and look at page 506 of the CFR.  Do

20  you --

21         THE COURT:  What's -- tell me what section.

22         MS. POINTER:  I'm looking at 655.23.

23         THE COURT:  All right.  Now, before you start reading

24  to me, did I understand correctly that the 2012 version of the

25  CFR has been enjoined, and we're using the 2008 version?  Is

1  that --

2        MS. POINTER:  Well, that's pretty close.  The 2013

3  version of the CFR for the H-2B program is enjoined.  If I had

4  realized that the 2012 version, which I'm unhappy to say I gave

5  you, has both the anticipated 2012 regulations and the old

6  regulations from 2008 that are in effect, I wouldn't have given

7  you the 2012 version.

8        THE COURT:  All right.  Let's look at the 2008

9  version then.  What code section do you want to look at?

10        MS. POINTER:  655.23.

11        THE COURT:  655.23.  Let me catch up with you.

12        MS. POINTER:  Now, when I personally look at it, I go

13  back to the Federal Register for December 19, 2008, to figure

14  out what's what in the H-2B arena.  The first set of

15  regulations with the HeinOnline on it that I gave you, Your

16  Honor, are the H-2A regulations.  The second set are the H-2B.

17        THE COURT:  All right.  655.23, what section?

18        MS. POINTER:  Okay.  If you look over in the second

19  column, you'll see, as you mentioned, Your Honor, the request

20  for further information has to be given within 7 calendar days.

21        THE COURT:  Right.

22        MS. POINTER:  That's under C.  If you look on down

23  under part 2 of C that specifies what the reasons have to be

24  given as to why there's a problem, specified date, 7 days

25  calendar days after the written request for more information.

And then if you go down to three, which is just below the sort
of fold at the middle, it says the certifying officer, that's
the CO, will issue the final determination or additional RFI
within 7 business days of receipt of the employer's response or
within 60 days of the employer's date of need, whichever is
later.

Now, one good thing about the H-2B program if
everything goes well is that you're supposed to get time --
typically more time to go through the USCIS and the consular
processes to get the individuals -- after you get your petition
approved by USCIS to get your individuals signed up with the
consulate, do their interviews, and get them authorized to
come. So you are right, Your Honor, there is no statutory
language beyond -- if you look in 8 USC Section 1184(c), it
says that all of the regulations involving the H-2 program that
are developed -- will be developed in consultation with the
Attorney General. And so the Labor Department is not free just
to decide on its own rules for either of these programs or
certain other programs.

Now, when the Department of Homeland Security was
created under 8 USC 1103, the duties of the United States
Attorney General were transferred to the Secretary of Homeland
Security. So in the H-2A program now, any regulation that is
promulgated by the Department of Labor must be approved --
that's the words in the 1986 Immigration Reform and Control Act

statute -- says it must be approved, and back then it was by
the Secretary of Agriculture, and the United States Attorney
General.  But in the context of the H-2B program, that text at
1184(c) that then specified consultation with the Attorney
General is now a duty of the Secretary of Homeland Security.

So that's where the statutory language is.  There's
one more piece of information that is not right here in this
regulatory section.  I think we cited it in the briefs, and I
can't cite it to you off the top of my head.  But in the H-2B
regulations, it does say that except for unusual circumstances
there will only be -- oh, here we go.  Under that same column
under ii -- iii, it says "If unusual circumstances warrant, the
certifying officer may issue one or more additional RFIs prior
to issuing a final determination.

Now, all of that is well and good, Your Honor, but
what we had in this case was it seemed like the Office of
Foreign Labor Certification having published the ETA Form 9142
that is used for both the H-2A program and the H-2B program,
that both the employer and the agent sign, as well as giving
the Department of Labor a signed agent agreement that's part of
the application package.  This 9142 is called an application
for authorization to hire foreign workers.  I can't tell you
exactly the nomenclature, but it's the 9142 form.

Having put that program, that set of documents,
through the Office of Management and Budget program for

1 paperwork reduction, having published the regulation saying for
2 the H-2B program this is the form we're going to use, the agent
3 and the employer have to sign the whole form and submit it in
4 original form, and there's got to be a declaration that
5 everything is under oath in those forms, and for the H-2A
6 program there's another form that has been through the
7 Paperwork Reduction Act, Office of Management and Budget
8 certification, and that's called an ETA 790, and the reason --
9 and that also has to be submitted to the Department of Labor in
10 original form -- I mean, with an original signature.  And the
11 reason they're two different forms is that that ETA 790 goes
12 into the local what I still call state employment office.  They
13 call it a SWA, State Workforce Agency now, and that's what
14 starts off the recruitment process in the H-2A program.  That
15 can be the document that's used to recruit US workers before
16 you even file or even if you don't file for H-2A program.

17           So one of the problems that we've got is these
18 so-called notice of deficiency and requests for information
19 came about because it seems to us that the office of Foreign
20 Labor Certification wanted to get this document in front of the
21 prospective employers, this document that we have put in the
22 record as our Exhibit 33.  It's called a questionnaire.  That
23 does not have any kind of indication that it went through the
24 Office of Management and Budget's Paperwork Reduction Act,
25 vetting to see if it's clearly stated, if it's really needed.

1   It's something somebody decided to do; and along with deciding

2   to do it, sometimes what we got were very late requests for

3   information or notice of deficiency.  One of them I can think

4   of was all about a month late from February 20 -- February 9 or

5   10 to March 9 or 10, even after the employer had been told that

6   the job order was acceptable.

7           THE COURT:  All right.  Let's back up before we get

8   too far down the road on these -- your clients' complaints

9   about these forms, because I'm still intrigued about your

10  interpretation of these deadlines under the H-2B program.

11          Under the H-2A program, there's very clear

12  congressional language in the statute:  7 days, not later than

13  30 days prior to date of need, et cetera, et cetera.  That

14  same -- which leads to its own issues.  The Government argues

15  you've got a "shall," but there's no remedy set out in the

16  statute, therefore, these other cases apply.  We'll get to that

17  in a little bit.

18          But here on the H-2B program, you're dealing with an

19  agency rule that seems to contemplate the potential for

20  continuing investigation and that type of thing.  So tell me in

21  a nutshell specifically what cases you rely on or how you would

22  articulate the argument that under the terms of the H-2B

23  program you're entitled to injunctive relief under the Code of

24  Federal Regulations deadlines that are set out.

25          MS. POINTER:  Well, first of all, the *US v. Heffner*

1    and Virginia Fourth Circuit authority that we cited in our

2    brief says that when the Department of Labor or any agency --

3    Justice Department, I believe, in the case -- one of the cases

4    that are cited -- undertakes a specific deadline in a

5    regulation, it's supposed to go by that regulation deadline.

6              Another point is that in the 2008 --

7              THE COURT:  What's -- tell me what the Fourth Circuit

8    case is.

9              MS. POINTER:  *US v. Heffner*, and, Your Honor, I'll

10   just have to tell you what the circuit case is.  I don't have

11   it at hand.  It's in our brief.  I just don't have it here

12   where I can lay my hand on it, I don't think.  I have to get

13   back to you on that, if I may.

14             THE COURT:  All right.

15             MS. POINTER:  Also, when the Department of Labor --

16             THE COURT:  I tell you what.  I hate to be a

17   stickler, but we need to look at that now.  The Fourth Circuit

18   case that I actually have here in front of me is the *Holland*

19   case -- is that the right one?  We have *Holland versus Pardee*

20   *Coal*, and then I've got -- what did I do with that other case?

21   You cited I think -- I've got too much paper up here -- I don't

22   know whether you're referring to the *Village of Bald Head*

23   Fourth Circuit case or something else.

24             MS. POINTER:  I think I am talking about a different

25   case for this specific point, Your Honor.

          THE COURT:  The reason I'm stuck on this at the

moment is that I can really very easily see two different legal

analyses applying.  I understand as a practical matter the

problem is the same for the employers.  They want their

employees by a certain deadline.  They're not getting responses

from the Department of Labor to allow them to proceed to have

those employees.  I understand the overlapping issues as a

factual matter.  But in terms of the legal analysis, I'm not so

sure the analysis isn't different as to the H-2A program where

you're dealing with congressionally established guidelines and

the H-2B program where you're dealing with the regulatory

framework based upon a general guideline or statute passed by

Congress.

          MS. POINTER:  Well, I guess, I've got a couple of

responses.  One, the case that I am citing along with the

Supreme Court *Heffner* case is *United States v. Morgan*, which is

at 193 F.3d 252, 266, and it comes from the *Heffner* case.  It

talked about the Accardi Doctrine where having the Justice

Department, I think it was -- it was the IRS actually -- having

adopted procedures that were more generous than the

Constitution required, the Supreme Court said, had to follow

it.  It vacated the discharge of a foreign officer of the State

Department because the State Department had failed to follow

the procedures that it had agreed to follow.

          Now, a backdrop or additional point regarding the

Department of Labor ETA Office of Foreign Labor Certification following these time limits under the H-2B program is that in 2008 the Labor Department delegated the enforcement activities under both of these programs to the Wage and Hour Division, and you see that in the budget analysis or justification, I believe it is, that we put in the most recent briefing for the fiscal year 2015 for the Department of Labor saying we have delegated to the Wage and Hour Division the enforcement aspects of the regulations under these two programs.

It is specifically in the H-2A regulations that the process will be investigation by the Department of Labor Wage and Hour Division and audits after certification, and I think there's a provision like that that's in the back part of the H-2B regulations that contemplates a flow of we've got a very time intense period within which employers that need these temporary workers, typically for seasonal activities, must get this work done.

Another thing to look at is those cases like *Larson* and *Flecha v. Quiros* that I cited at the beginning of our brief go back to before the H-2A and the H-2B program was split. That wasn't -- it was the same, same statutory authority, until the Immigration Reform and Control Act in 1986. *Rogers v. Larson* and *Flecha v. Quiros* were both 1997 cases; *Orengo Caraballo* in the DC circuit was after IRCA was passed in '86. It was decided in 1993.

1          But kind of the going principle under both these

2    programs -- and, as I say, they weren't viewed as separate

3    programs until IRCA, although agriculture was treated

4    differently by the Department of Labor.  There were regulations

5    that were published for agriculture.  There were guidance

6    memoranda published in connection with nonagriculture H2

7    workers.  But the courts have repeatedly said, and I think it's

8    in the legislative history of the Immigration and Nationality

9    Act from when this section got passed by Congress in 1952, the

10   common purposes of this program, meaning what we now call the

11   H-2A and the H-2B program, are to assure an adequate labor

12   force on the one hand and to protect the jobs of citizens on

13   the other, meaning citizens similarly employed who want these

14   jobs.  It says, "Any statutory scheme with these two purposes

15   must inevitably strike a balance."

16          So if you don't have a program that allows an

17   employer to get a decision and to get workers if he's entitled

18   to get them, if his wages and working conditions that he's

19   offering to provide anybody who wants the job and still will as

20   he's advertising for the job, if you don't allow that farmer or

21   that shrimp processor or resort operator to have a worker when

22   he needs that worker, it doesn't do any good at all.  The

23   program is a bust.

24          THE COURT:  Even the H-2B program wouldn't

25   necessarily allow that.

1          MS. POINTER:  Sir?

2          THE COURT:  Even the H-2B program regulation wouldn't

3  necessarily allow that because the regulation you read, as I

4  understood what you read, said that it's from the date of the

5  last RFI or 60 days prior to the date of need, whichever last

6  occurs, right?

7          MS. POINTER:  Well, but -- and I think what we're

8  missing is how far in advance those applications get filed.

9          THE COURT:  Maybe, but doesn't the regulation

10  contemplate that if requests for information are ongoing, that

11  may run into?

12          MS. POINTER:  It says except for unusual

13  circumstances, Your Honor, and I don't think we've got any of

14  those unusual circumstances that occurred just because the

15  Department of Labor wants, if you will, a fourth or a third

16  confirmation by an employer that ILMC is its agent and that the

17  terms that both of them have set forth in original signatures

18  are real terms.

19          We're not dealing with this questionnaire in a

20  vacuum.  We're dealing with it in the context of a set of

21  regulations that began development in this area in 2008.  Until

22  that year, just the agent himself could file the jobs order or

23  the application on behalf of the employer.  Starting then, both

24  the agent and the employer both had to sign the original forms.

25          So to ask employers, really without knowing what to

expect that the Department of Labor is even asking them to take

additional steps that aren't contemplated in the regulations,

because the regulations contemplate that the agent may make the

application, may file the application on behalf of the

employer, whether you're talking about H-2A or H-2B, and will

answer the questions on behalf of the employers seeking

information from the employer when the agent needs it and will

be the interface with the Department of Labor, and all of a

sudden what you've got is letters that are supposedly going to

employers directly. We've got instances where we know they

were never sent. We have other instances where we've been told

they've been sent, and we've been asking multiple times over

weeks for a tracking number. The only tracking number I've

seen is one that does not exist, I'm told, in the UPS system.

And so we have chaos because the Department of Labor

is not following its own regulations of who it deals with and

in what forms in the whatever time period you're talking about.

THE COURT: Well, Department of Labor says that these

principles and individuals associated with International Labor

have been indicted, and we've got a heightened duty under those

circumstances. What do you say to that?

MS. POINTER: I say that is not the role of this

agency to make a decision about it or even an inquiry about at

this point. It might be -- under the regulations, I think it's

(H)(ii)(a), 655.130(e), if you come across something in the

1   course of an application processing that is of concern for

2   followup, you refer it to the Wage and Hour Division or the

3   Solicitor's Office, and there's a provision in the H-2B

4   regulations that gives the Department of Labor Office of

5   Foreign Labor Certification authority to pass it along to -- I

6   think it says US Attorney Justice Department.  It definitely

7   says Wage and Hour.

8           So if you take as a standing principle that anybody

9   who is accused of any kind of criminal act is entitled to a

10  presumption of innocence, and --

11           THE COURT:  Why does that apply in a civil context?

12           MS. POINTER:  Well, I'm glad you asked that question,

13  because the case that we cited that's a Supreme Court case in

14  that workers' compensation case quotes both the Senate and the

15  House Of Representatives at the time that the Administrative

16  Procedure Act was under consideration, I think, in '46 -- maybe

17  '47 -- but '46 that says everybody is entitled to a presumption

18  of regularity in their dealings with us in these matters.

19           THE COURT:  That's different from a presumption of

20  innocence.

21           MS. POINTER:  Sir?

22           THE COURT:  That's different from a presumption of

23  innocence.

24           MS. POINTER:  Well, there are statutes in which

25  someone who is accused of a crime might be -- after due process

hearing, but not just on somebody's idea that this is a good
idea -- be suspended from participation, but that's not this
case.

Somebody on about March 1 decided that because there
had been some allegations that -- by the way, I believe at that
time had resulted in not guilty pleas on all defendants'
parts -- decided that it would be a good time to start making
other inquiries. Well, those inquiries are simply not
contemplated under these regulations, and they have caused all
kinds of devastating results. They were sent to people's
business addresses, but the businesses in Wyoming at the top of
a mountain are closed in the wintertime. So it was weeks
afterwards when they found that this thing had been set, and
I'm not even sure that it was ever found that it was sent to
that business location.

Somebody up in Minnesota -- somewhere around the
7th or 10th of March, ILMC heard from a client that he had
gotten this thing called a questionnaire, what to do with it?
Well, it says on the form, big as life, return it to Chicago
yourself, don't send it through your agent, we don't want it
from your agent.

So ILMC said to that client send it back yourself and
that day sent out emails to everybody who had email
addresses -- you understand, a lot of the farmers that this
entity works for or other employers don't have email addresses.

1   They're in Tennessee on a mountain where you don't even get an
2   email internet signal.  They may not have a fax machine.  So
3   they started contacting people to tell them to look for these
4   forms.  They found some about 10 days -- one of them in
5   Minnesota on the same property, same property address as the
6   business, but the snow was so deep they didn't find it until 10
7   days later.

8           So what I have to say to you is while allegations
9   understandably are serious, nonetheless there is no basis, no
10  lawful basis, to intrude on and to destroy these other
11  businesses that are dependent on ILMC or ILMC itself based on a
12  supposition that, well, maybe there's something not quite right
13  here, when what the agency had in front of it is the full set
14  of papers that its regulations say it's entitled to have.

15          This is not saying they couldn't do an audit post
16  certification, but it is certainly saying they can't say we're
17  just going to throw away the whole regulatory structure and do
18  what we think is best.  That's just -- ad hoc rulemaking is
19  just not the way we do things, particularly without
20  consultation with these other agencies.  But even with
21  consultation, that would just be wrong.

22          THE COURT:  So your position is if they have a
23  concern, there are processes they can go through procedurally
24  and address it, debar ILMC, whatever comes of that after the
25  appropriate processes, but to stop processing applications is

1   improper.

2           MS. POINTER:  That's exactly right.

3           THE COURT:  All right.  You may continue.

4           MS. POINTER:  Thank you.  I want to be responsive to

5   the Court's particular concerns.  It seems like you may be

6   aware of the extensive legislative history associated with the

7   H-2A program whereby --

8           THE COURT:  Your cocounsel over there, Mr. Forney,

9   has taken me through this road before, so I know some of it.

10          MS. POINTER:  I would say that I tried to convince

11  Mr. Forney's agency last week that the efforts by -- lead by

12  Senator McConnell to restrict statutorily the Department of

13  Labor's authority to do anything but make its decisions on the

14  certification for H-2A within a 15-day period, that's the net

15  result of reducing the time from 60 to 45 days that you can

16  require the farmer to file the application and then making the

17  Department of Labor make its determination no later than 30

18  days.

19          THE COURT:  Well, let me ask you a question.  As I

20  read the regulations, if the -- and back to the H-2A program at

21  this point.  At least as I understand them, application is

22  made.  The certifying officer then within 7 days notifies of

23  any deficiencies; and, if not, there's some notification saying

24  here are the advertising steps we believe you should take, the

25  regions, the manner, all those kinds of regulations.

1        In this case because that notice was never sent,
2   haven't been through those advertising steps to test the
3   market, so to speak, the labor market.  So if I grant your
4   injunctive relief, I am -- I would be granting that relief --
5   let's say that I order the Department of Labor to issue the
6   certificates at this point so you all -- the employers can
7   proceed ahead.  Well, at this point it's undisputed that no
8   steps have been taken to actually test the market, and it's --
9   I think 1188(a)(1) requires the Department of Labor to certify
10  that there will be no adverse effect on the American labor
11  market, and there is a need as represented by a farmer.

12        So the Government makes a point, a reasonable point,
13  that if I order injunctive relief, we skip over the testing of
14  the labor market.

15        MS. POINTER:  And we have no problem at all with
16  doing every step.  Perhaps Your Honor is not aware that often
17  certification is issued before those Sunday newspaper and one
18  other newspaper advertisements are run.  You're probably aware
19  that H-2A employers must employ any US worker who said he wants
20  the job for 50 percent of the time that the foreign workers are
21  here.

22        So as a practical matter, if you granted
23  certification today and said to Mr. Forney his agency must
24  issue them by April 8, we will immediately tell Department of
25  Labor what US workers had been found through the employer's

1  contacts with former workers, their version of none --

2          THE COURT:  And that still skips the process because

3  it's the certifying officer who tells the employer what steps

4  to take.

5          MS. POINTER:  Those are routine matters.  They tell

6  the Tennessee Growers to advertise in Georgia and Kentucky,

7  they tell the Georgia employers to advertise in South Carolina

8  and Alabama, all of which already have beaucoup job orders

9  certified and workers in place.

10         And so if a US worker wants the job, we will

11 absolutely do the advertisement that is required by the

12 certifying officer as long, of course, if it's otherwise in

13 accordance with the regulations.  We'll give the recruiting

14 report.  We'll send in the worker compensation certificate of

15 coverage.  There's one other thing, the State has to say it's

16 inspected the housing.

17         We are a month away at our best hope of getting a

18 worker here in this country able to work by May the 8th if we

19 find out and get a certificate on April the 8th because of the

20 other processes that have to be done.  So all through that next

21 month, all of those processes that you're concerned about can

22 be done, and we absolutely will do.

23         And let me tell you one other thing, Your Honor, if I

24 may, and I apologize.  These are things that we worked out with

25 the Department of Labor years ago, if there were questions

about whether or not there was a Department of Labor position
that was unreasonable or somebody wasn't offered a sufficient
recruiting opportunity.  We gave you cases that I had in my
stack of files from 1977 when the Department of Labor took what
all of the apple growers thought were very unreasonable
positions about having to continue to advance transportation.
The Department of Labor lost every issue.

There was another set of issues in 1986, and if I had
the injunctive orders, I would give them to you.  But I
remember them, and they are discussed in the *Donaldson* Fourth
Circuit case where the Department of Labor's position was the
growers may not start a different methodology of payment, and
so the Court struck that down and allowed the growers to get
the workers to save the crops.

So back to the main point.  Whatever is contemplated
by the regulations in terms of recruitment of US workers will
be done.  I have to tell you, it's a sham and a charade because
there are virtually no US farm workers left in this country who
are willing to do the jobs that the foreign workers are brought
in to do, but it's still a law on the books, and we'll fully
comply with the requirements to look for the worker --

THE COURT:  Which brings us to the distinction of
mandatory action versus discretionary action, which is another
point brought up by the Government in its briefing, and that is
if it's a discretionary action by the Department of Labor, then

1  in that case it's problematic for a court to intervene because

2  we're, in effect, imposing policy.  If it's mandatory, then

3  there is some basis upon which we can intervene.

4         Here, the H-2A program, the statutes and the

5  regulatory scheme under these facts results in what I would

6  consider to be a hybrid mandatory/discretionary, mandatory time

7  deadlines, but discretionary advertising steps leading to

8  certification; and it seems to me difficult to issue an order

9  requiring the Department of Labor to issue the certificates

10  because they're no longer timely without impinging on that

11  discretionary authority of the Department of Labor.  Now, you

12  may disagree, but I would be curious to hear your response.

13         MS. POINTER:  I do disagree.  I think where -- the

14  regulations at the back of the H-2A section lists the things an

15  employer must do in order to get a certification, and we have

16  done them all.  We have provided the original signatures.  The

17  agent has given his agency agreement.  The kinds of things the

18  Department of Labor have complained about like saying we'll pay

19  the subsistence rate in effect at the time the cost is

20  incurred, we've done -- we've -- the same farm, Bryant Farms,

21  that on April the 5th, 1911, won an administrative law judge

22  opinion saying as long as the farm is promising to pay the

23  subsistence rate in effect at the time the cost is incurred,

24  they don't have to update their job order when in March or so

25  you publish the new subsistence rate.  They've already got that

1  covered and --

2       THE COURT:  But you haven't done everything because

3  the Department of Labor hasn't sent the notice asking you to do

4  specific types of advertising or whatever you want to call it.

5       MS. POINTER:  Well, the context is exactly that --

6  there's a formula content of the job advertisement that's based

7  on the 942 job description and the wage rates.

8       But if I may, I found the section I wanted to draw to

9  your attention.  At 20 CFR 655.161, the heading is:

10       "Criteria for Certification.

11       The criteria for certification include

12       whether the employer has established the need for

13       agricultural services or labor to be performed on

14       a temporary or seasonal basis; complied with the

15       requirements of 653 *[that's have a job order that*

16       *was accepted in the interstate clearance system,*

17       *which is the 790 form]* and 654 of this chapter

18       *[which is the housing, housing has to meet certain*

19       *either OSHA or ETA criteria]*; complied with all

20       this subpart, including but not limited to the

21       timeliness requirements... *[in terms of when it*

22       *filed]*; complied with the offered wage rate

23       criteria *[and they've done that]* ... and met all

24       the recruitment obligations."

25       Well, the only reason we have not met the recruitment

1   obligations is in some instances they told us they sent us

2   notices of acceptance that we never got, and they know we never

3   got them, and they haven't even told us we don't know how to

4   track which ones we have and which ones we don't have.

5        The process is supposed to be that the Department of

6   Labor contacts the agent and notifies -- if the agent has

7   agreed now to receive the information by email -- notifies the

8   agent by email with a copy to the farmer.  We see photocopies

9   of what look like prepared documents in Mr. Forney's file, and

10  I think you'll have to agree this is so, that we never got, and

11  there's no proof that we were ever sent them or sent them to a

12  valid address.

13       So in those circumstances, it seems extraordinarily

14  hard when the chaos is created by the agency that says, oh,

15  please let us have another chance, it seems extremely hard to

16  contemplate that a federal judge can't order the certification,

17  particularly when we say we will comply with all of these

18  requirements.

19       Now, going back to the regulatory structure back in

20  the '70s and '80s, certainly I recognize that the *Frederick*

21  *County Fruit Growers* and the case from Maryland were decided

22  that I sought -- brought to your Court's attention were

23  decided, I think, after *Blackwelder*, but before the current

24  standards.  But if you read those opinions, there's no doubt

25  that those judges thought the circumstances of the Department

of Labor insisting that before it would even accept their
application they had to agree to advanced transportation to all
workers, that there's no question in my mind that the courts in
those cases would have granted the injunction saying that we --
we are asking for because the Court said you must accept those
applications, even though you think those criteria failed to
protects US workers.

The judges said we think you have been unreasonable.
You can't just require the advanced transportation to American
workers as a standard of US -- as a standard of US terms and
conditions of employment because that's what the Jamaican and
other Caribbean governments used to require as part of your
labor negotiation. Now, what happened there was the growers
got a concession from the -- from the Jamaican government which
negotiated on behalf of the workers they no longer had to do
it. Department of Labor said, well, we think you still should
do. We think that's become a condition of employment, and the
courts disagreed.

So the cases in Maryland were *Blue Goose Growers*, and
I have a copy of that that's in the record now, that's Docket
Entry 30-4, and also *Frederick County Fruit Growers
Association*, which is a reported case, that's at 30-7, and then
there were two more of those opinions that involved temporary
restraining orders and or preliminary injunctions up in New
York and New Hampshire. So those judges said we can order the

1  Department of Labor to take a job criteria that the Department

2  of Labor thinks is not adequate and say that the employers must

3  be given the opportunity to have the workers to save the cost.

4        And I believe some of those cases involve situations

5  where they were so close up against the deadline of having

6  workers come pick the apples that those were also done without

7  recruitment.  Yes, *Blue Goose* was a September 15 decision.

8  August in New York would have definitely been right up against

9  the picking deadline.  August in New Hampshire and Virginia

10 was -- well, unfortunately, I don't have the date of that

11 decision.

12        THE COURT:  Let me turn you for a second to one of

13 these exhibits you handed up, this spreadsheet entitled

14 Exhibit 1, Status of ILMC's 2014 H-2A Applications as of

15 March 15.

16        MS. POINTER:  I'm sorry, Your Honor.

17        THE COURT:  I want to turn to one of the exhibits you

18 handed up.

19        MS. POINTER:  Yes, sir, Your Honor.

20        THE COURT:  Exhibit 1, Status of ILMC's 2014 H-2A

21 Applications as of March 15.

22        MS. POINTER:  Yes, Your Honor.

23        THE COURT:  I want to make sure I understand this

24 chart.  So on page 1, we start with Emerald Sod Farms, and

25 we've got a date of need, received, notice of deficiency issued

1  is what I understand that to mean --

2           MS. POINTER:  Right.

3           THE COURT:  -- reply to notice of deficiency, then a

4  due date for the acceptance.  Acceptance was received, RR,

5  2/17.  What's RR?

6           MS. POINTER:  Recruitment report.

7           THE COURT:  Okay.  2/17, certification due

8  February 8, certification has been received in that case for

9  nine workers.  So that's an improved but untimely processing

10 there.

11          MS. POINTER:  That's right.

12          THE COURT:  So at this point in time in terms of

13 injunctive relief, that particular employer, injunctive relief

14 would be moot because they've received the relief they desired.

15          MS. POINTER:  Yes, Your Honor.

16          THE COURT:  All right.  Then you go down to P & M

17 Farms on the same page.  No notice of deficiency, but the

18 certificate's been received, so, again, there would be no --

19 injunctive relief would be moot as to that employer.  So it's

20 all the shaded employers according to this chart are your H-2A

21 cases, is that correct?

22          MS. POINTER:  These are all H-2A cases, and I believe

23 that the shading -- Your Honor, I can't even tell you what the

24 shading was.

25          THE COURT:  I think it means the certificate has

1   not -- a final certificate has not been received from the

2   Department of Labor as to each of those two -- each of those

3   cases, correct?

4          MS. POINTER:  I can't answer your question.  I just

5   don't know the answer.  I can tell you that looking at Carolina

6   Farms and Harvesting, what we were trying to do is to show what

7   has happened.  All of a sudden in early February, March, the

8   Department of Labor stopped certifying our jobs and started

9   sending out these what we call confirm again that ILMC is the

10  agent and that the job that's on the papers is -- accurately

11  describes the job.

12         We submitted Exhibit 42 that shows the status as of

13  March 21 of the certifications.  We have a number --

14         THE COURT:  Let me -- I don't want to leave

15  Exhibit 1.  The reason I do not want to leave Exhibit 1 is

16  because as between the H-2A and H-2B applications, regardless

17  of the ultimate legal analysis, there are, at a minimum,

18  different time frames as to the employer clients of ILMC.  So

19  when I get a chart that has all the applications H-2A and H-2B

20  mixed together, then --

21         MS. POINTER:  These are all H-2A.

22         THE COURT:  I understand.  But your Exhibit 42 is

23  entitled Status of 2014 H-2A and H-2B applications as of

24  March 21.

25         MS. POINTER:  All right.  Let me just see if I can't

 1   resolve that.  The only H-2B job on Exhibit 42 --

 2             THE COURT:  Um-hum.

 3             MS. POINTER:  -- is on page 5 of 5.  That's D7

 4   Roofing.  All of the other jobs are H-2A.

 5             THE COURT:  All right.  Turn to Exhibit 1, page 9 of

 6   9.

 7             MS. POINTER:  Those are the only H-2B jobs on

 8   Exhibit 1.

 9             THE COURT:  Then should I assume from -- by comparing

10   Exhibit 42, which is the date March 21, and Exhibit 1, which is

11   dated March 15, that American Decorating, Inc., Adler's

12   Landscape Nursery, and Georgia's Market and Nursery have all

13   received their certificates at this point?

14             MS. POINTER:  No, and here's the problem.  There are

15   only 33,000 H-2B VISAS that can be issued in the two respective

16   six months period of the fiscal year, and so for those other

17   jobs, for American Decorating and Adler's Landscape and

18   Georgia's, I believe that we just flat ran out of time to go.

19   I don't -- I cannot tell you for absolute sure what the status

20   is of American Decorating and Adler's.

21             THE COURT:  Is there anything for me to address as to

22   those?

23             MS. POINTER:  No, there's nothing to address at this

24   time as to those.  Georgia's market is a dead dog because we

25   believe that the -- there would have been sufficient visas

1   still left if that application had been processed in the normal

2   time, but that application, I believe, has already been

3   reapplied for under the 33,000 that can be granted for

4   applications that are submitted on and after April 1.

5           THE COURT:  So D7 Roofing is the only application

6   left that's ripe for determination in this suit.

7           MS. POINTER:  Of the H-2Bs.

8           THE COURT:  On the H-2Bs.  All right.  Anything else

9   at this point?

10          MS. POINTER:  Well, I do want to be really careful

11  that I've not overlooked the position of -- the Department of

12  Labor is saying even the H-2A time limits are precatory or

13  aspirational when all of that activity occurred over the summer

14  of 1999.  When, you know, Senator McConnell proposed the

15  change, right away Department of Labor later that month, after

16  the Senate report came out I think the 17th of June, all of a

17  sudden a regulation that had been proposed a year ago when the

18  farmers were complaining comes out as in final at the end of

19  June, June 29, oh, well, you don't have to take the application

20  more than 45 days.  So now they could say that there was no

21  need to do this extra change of making the Department of Labor

22  issue the certifications 30 days in advance.

23          So in the conference committee in August, the House

24  of Representatives over Department of Labor, labor unions, Farm

25  Worker Justice, all kinds of people, over their objections, the

1  conference committee report says we've agreed to the Senate

2  position.  That's in August.  September, the congressional

3  research service comes out with a long report that we put in

4  the record here that explains this means for H-2A Department of

5  Labor has got to make its decision in 15 days.  We are serious

6  about getting people in the country to plant the crops and

7  harvest them on time.  So --

8          THE COURT:  Let me explain something to both sides so

9  it's clear.  I understand a lot of this legislative history and

10  congressional statements and that type of thing, but

11  ultimately, with respect to the H-2A, it may not apply.  But

12  looking at whatever you want to call the deference, chevron or

13  otherwise, the congressional -- the statute is clear as a bell.

14  The regulation is clear as a bell.  The difficulty comes, as

15  the Government has pointed out, when the statute says "shall"

16  but does not provide a specific remedy, then what can the Court

17  do under those circumstances?  The Government says nothing

18  because the failure to provide a remedy ends the inquiry.  I'm

19  going to talk to Mr. Forney about that when we come back.  But

20  in terms of the deadlines themselves, at least with respect to

21  the H-2A program, the regulations and the statute are clear as

22  a bell.  I don't care what Senator McConnell said when the

23  statute was passed.  What they wrote is clear.

24          MS. POINTER:  Well, Senator McConnell was saying --

25  we would agree with Senator McConnell.

1          Let me just say then, our client and its clients,

2  because it is the authorized agent in writing, and the agency

3  agreements are in this record in the one, two, or three

4  exhibits -- in the early exhibits we submitted, they will do

5  every recruitment step that is required.  They will hire every

6  US worker who says he or she wants the job and meets the

7  minimum qualifications of being ready, willing, and able to

8  take the job at the time and place needed, and that's a pretty

9  close quote to 1188 as it is now written in the first section.

10          So there is no earthly reason that the Department of

11  Labor can't issue these certifications, and meanwhile we will

12  do in the next 30 days all of the work we have to do to make a

13  standby work force available that we can't get any sooner than

14  30 days.  Even when those workers get here, Your Honor, if

15  there is a US worker who wants these jobs, that man or lady

16  gets that job, absolutely.  When the Department of Labor

17  accepts these jobs, these job orders go up on the internet.

18  You can search for strawberry jobs, or tomato jobs, or bean

19  picking jobs, your peach picking jobs, you can search them for

20  a particular employer, you can search for a particular state.

21  There are lots of different ways if you go to your Employment

22  Service Office and you want these jobs.

23          The problem is that any amount of money that is --

24  even the Department of Labor considers is reasonable, which is

25  high, you know, it's over $10 an hour lots of places now, we

1   can't get US workers to come.  The reports say they don't even

2   stay once they take a job.

3          But we're not here to argue those issues now.  We are

4   in a practical situation that these farmers and ranchers who

5   need these people to plant their crops -- if you've had a

6   chance to read the affidavits, they're talking about the lady

7   who's dependent -- two-thirds of her income --

8          THE COURT:  I have.

9          MS. POINTER:  Well, thank you, Your Honor.  I'll cede

10  the floor.

11         THE COURT:  We'll take about a 10-minute recess and

12  come back.  Then I'll hear from the Government.

13         (At 3:45 p.m., break taken.)

14         (At 3:55 p.m., break concluded.)

15         THE COURT:  All right.  Mr. Forney, I'll hear from

16  the Government at this time.

17         MR. FORNEY:  Thank you, Your Honor.  I had intended

18  to start with the issue of mootness, but I was happy to hear

19  that the plaintiff's counsel conceded the point that in those

20  cases where certifications have been received, those are now

21  moot.

22         By their own Exhibit 58, ECF 29-6, we actually have

23  60 employers which now have certification.  So those cases, as

24  conceded, are moot.  We've got 21 cases where on their exhibit

25  notices of acceptance have been received, so those cases are

1 also in further process, and the onus is on the employers to

2 complete the statutorily required recruitment process.

3      That leaves us three outstanding cases on their own

4 exhibit, but I heard from the Department of Labor this morning

5 that Cooper Creek now has a notice of acceptance. That was

6 actually received on April 2.

7      Carolina Farms has also been given a notice of

8 acceptance. I believe that occurred late Friday or early this

9 morning.

10      M & H Tobacco actually filed an administrative appeal

11 with the Board of Alien Labor Certification Appeals, so at

12 least with respect to that employer, it has chosen to take an

13 administrative appellate route and perhaps does not desire to

14 be heard in this court because, as we know, a regulated entity

15 cannot be in two places at once. If they choose an

16 administrative appellate route, they cannot appear at the same

17 time in federal court. I think that that case may be resolved

18 through settlement, but nevertheless it does show that at least

19 with respect to some employers, they're not in complete concord

20 with their agent. They've actually chosen to go another route,

21 to the BALCA.

22      So at least with respect to almost every single case

23 that we have on their own exhibit, I would argue that those are

24 moot or have actually had further administrative process

25 showing that the Department has acted reasonably under the

1 circumstances and that the onus is now on the employers to

2 complete the process as required by Congress.

3        THE COURT:  All right.  Pick one where you contend --

4 I guess you're looking at Exhibit 1, or are you looking at --

5        MR. FORNEY:  Exhibit 58.  It was recently filed with

6 the plaintiff's reply brief, ECF No. 29-6.

7        THE COURT:  All right.  Hold on a second.

8 Exhibit 58?  All right.  So let's see.  Looking at Exhibit 58,

9 you've got Gallrein Farms is the first one.  According to

10 Exhibit 42, the application or request was originally sent on

11 February the 18th, notice of deficiency sent on March the 12th,

12 they replied to the notice of deficiency, the acceptance was

13 received on March 31, according to this chart, and we don't

14 have a certificate.  So even --

15        MR. FORNEY:  I'm sorry, Your Honor, perhaps we're

16 looking at two separate documents.  I'm looking at Exhibit 58,

17 it's ECF.

18        THE COURT:  Right.  What's not on Exhibit 58, as I

19 read this, is the date that the original certificate was

20 submitted and received.

21        MR. FORNEY:  Well, actually I'm looking at the first

22 employer, Matthew Hancock, and it lists the certification date

23 received -- it's a comparative chart, compares last year and

24 this year.  But with respect to this year, certification was

25 received on 3/26/14.

1          THE COURT:  Wait a minute.  Who is your first

2    employer?

3          MR. FORNEY:  Matthew Hancock.  I'm looking at

4    Comparative Treatment by Department of Labor of ILMC and Its

5    Clients in 2013 and 2014.

6          THE COURT:  Right, Exhibit 58.

7          MR. FORNEY:  Yes.

8          THE COURT:  Maybe I'm missing a page.  My first

9    employer is Gallrein farms.

10         MR. FORNEY:  No, I'm sorry.  My ECF, I'm sorry, cut

11   off the first several pages.  I'm sorry.  Okay.  I apologize.

12   My count must be incorrect then because I started at page 6.

13   That's my fault.

14         Nevertheless, the fundamental point remains the same

15   that at least on their own chart, plaintiff's counsel has

16   conceded that those -- where we have certifications received,

17   which were quite a number, quite a few of these actually if you

18   just scan down the chart, those are all moot.

19         THE COURT:  Right.

20         MR. FORNEY:  And we also see that acceptance has been

21   received by quite a number of these individuals as well and, in

22   fact, shows further ongoing administrative process at this

23   point which is now with the employers so that they can complete

24   the required recruitment.

25         THE COURT:  So your position would be in the cases

1   where the required -- where the acceptance has been received

2   and the Department of Labor has directed the required

3   recruitment, then it would be premature to award relief until

4   those individuals have -- or those entities have completed the

5   required recruitment.

6          MR. FORNEY:  Right.  Now, the cases that plaintiff's

7   counsel points to indicating where the Court has ordered

8   affirmative injunctive relief by the granting of some kind of

9   certification are all pre-IRCA, the Immigration Reform and

10  Control Act of 1986, and the regime before IRCA didn't have the

11  voluminous and quite extensive statutory requirements that we

12  have in the H-2A program, and it would be perverse to -- in

13  that context to allow the employers to circumvent those

14  statutory requirements potentially harming the domestic labor

15  market.

16         THE COURT:  Why wouldn't it be equally perverse to

17  allow the Department of Labor to ignore the congressionally

18  established time frame?

19         MR. FORNEY:  Well it, hasn't ignored the time frame.

20  It has attempted to work within the time frame.  Admittedly, it

21  has not met that time frame in this season, but it is

22  reasonable under the circumstances given the facts --

23         THE COURT:  Gallrein Farms submits an application on

24  February the 18th, and they get a notice of deficiency on March

25  the 12th?  That's not even close if the entire statutory scheme

contemplates applications no earlier than 45 days of the date

of need and the certificate being issued 30 days prior to the

date of need.  I mean, that's three weeks.

MR. FORNEY:  Certainly, Your Honor, it may be

unfortunate, and it may be regrettable circumstance; but the

case law dictates that even if we had agency negligence, that

without a consequence attached to a statutory time frame,

there's nothing this Court can do to strip the agency of

jurisdiction and order affirmative relief.  It's just not

possible.  The *Pierce County* and subsequent cases, including

cases in the Fourth Circuit, indicate that that is the law

regarding statutory time frames.  I mean --

THE COURT:  Well, (a)(1) -- or 1188(a)(1) only

requires that an employer have applied for a certificate at the

time.  Am I reading that correctly?  Let's see.

MR. FORNEY:  Yes, the employer is required to seek a

certification from the Secretary of Labor, but further down in

subsection C we get further indication as to the requirements

that the employer is supposed to fulfill, and that is to

complete the recruitment of the domestic labor market and

provide the assurances that there's not an adverse effect on

the wages and working conditions of similarly employed US

workers.

There's just no way they can do that in advance of

receiving certification if they actually haven't tested the US

labor market, if they're not even aware that there are US

workers for these jobs.  If there's no advertisements, no

positive recruitment that's done, there's no way they can

provide those assurances, and there's no way the Department of

Labor can accordingly comply with the statute --

THE COURT:  I'm not trying -- they're not asking me

to withdraw jurisdiction from the Department of Labor, as I see

it.  You all can continue on with whatever you want to do.

What they're saying is the time frames have passed, and we're

entitled to our certificate.  And it may be that you don't

trust ILMC because they've been indicted and they have these

issues, but by ignoring ILMC you're really hurting the

employer, not the agent.

MR. FORNEY:  Well, I'm not conceding the point, but

even if it were true that the employer were harmed by this

because the date of need has passed or the statutory time frame

has been superseded, it's still jurisdictional in the sense

this Court cannot take from the Department of Labor what it's

supposed to fulfill under the statute and take it upon itself

then to impose additional obligations on the Department that

would circumvent the statute.  That's just not possible under

*Pierce County* and subsequent cases.

Moreover, it really is unfathomable what we would do

administratively with such an order.  What if Your Honor were

to order that we were to grant certification and somehow

1  fashion a regime in this particular circumstance to allow for

2  post certification recruitment, which, by the way, the

3  regulations do not contemplate, contrary to the plaintiff's

4  counsel assertions.  There's nothing in the regulation that

5  contemplates doing post certification recruitment, and I don't

6  know of any.

7          But let's just suppose that the Court will order such

8  extraordinary relief in this circumstance.  What will we do

9  administratively if then the particular employer did discover

10 US workers?  Would they have to then displace their foreign

11 workers and send them back, pay for their transportation back

12 to the foreign country thus putting a burden on the foreign

13 workers?  It just is unmanageable, and Congress did not want

14 that type of situation to occur.  It wanted to have the

15 requisite assurances up front labor market tested in advance

16 before foreign workers enter the domestic labor market --

17         THE COURT:  Yes, it did, and it told the Department

18 of Labor what it wanted, and that's not being done.  It may be

19 negligence, it may be intentional, I don't know.  The record

20 wouldn't support a finding either way.  All I know is at least

21 on the record before me, it's not done within the specific time

22 frames as required.

23         MR. FORNEY:  Sure, and we cannot deny that point.

24 Nevertheless, if you take, for example, *Hosh*, which involved a

25 situation where Congress imposed a completely -- a much more

draconian deadline on the agency in that case to take into
custody aliens when they're released from state incarceration,
and in *Hosh* -- in that case, the timeline had passed by several
years. Nevertheless, the Court found that the Government could
not be stripped of its jurisdiction to take those aliens into
custody. They blew the deadline completely by years. But
ordering then stripping the agency of jurisdiction in that
context simply because they overlooked this particular alien
and blew the timeline under the statute could potentially have
a harm on the public, as it would here. There could be a harm
to the domestic labor market by importing these foreign workers
without having done the requisite test of the labor market --

      THE COURT: What about the harm to the employer and
the farm within the domestic labor market?

      MR. FORNEY: Congress did that balance, and the
balance tips in favor of the public here.

      THE COURT: Based on what?

      MR. FORNEY: Based on the legislative history and the
text of the statute which outlines rigorous recruitment
standards that have to be met before foreign workers can enter
this country. Negligence or malfeasance on the part of the
agency -- I'm not conceding that that happened -- but even if
that were the worst case scenario would still not warrant
bringing those foreign workers into this country without
finding the domestic workers first.

1          The same case as in *Holland* which we cited that if

2    Your Honor were to look at this issue in detail, the text, the

3    legislative history, and Congress's failure to specify a

4    consequence when it amended the statute in 1999 all counts in

5    favor of not granting the relief that the plaintiffs are

6    requesting.  The simple fact remains, Congress did not impose a

7    consequence in the text of the statute, and there's just no

8    legislative history that contemplates any consequence.  Even

9    the legislative history that plaintiff's counsel brought to the

10   Court's attention recently gives a rather facile discussion of

11   the issue simply mentioning the new adjustment of the time

12   frames, but it did not attach a consequence.

13          So under *Pierce County* and subsequent cases,

14   including cases in this circuit, the Court is unable to grant

15   the relief that they've requested because the time frames under

16   the statute are not jurisdictional, they're procedural only.

17          There's another issue, too, at least at this stage.

18   The plaintiffs are actually asking through a preliminary

19   injunction to alter the status quo.  It's a similar point to

20   the lack of jurisdictional mandate in the statute under the

21   timeframes, but it's even more pressing in this context

22   because, as you know, preliminary injunctive relief is

23   extraordinary and granted only under rare circumstances.

24          The defect in the plaintiff's request is similar to

25   what happened in *Salt Pond Associates* where the Court refused

to alter the status quo by granting the canal permit that was still under adjudication. The Court noted that there were still a merits determination to be made by the agency, and the Court could not substitute its own judgment for the agency which was still undergoing administrative process, and that's the same thing we have here.

THE COURT: Let me ask you, are you familiar with the *Sierra Pacific Industries* case, the Ninth Circuit case, 1989 case? I can't recall if that was cited or not.

MR. FORNEY: No, Your Honor.

THE COURT: That case discusses *Brock* and the *Fort Worth* line of cases holding that:

"Government agencies do not lose jurisdiction for failure to comply with statutory time limits. The Supreme Court in *Brock* specifically contemplated that other remedies were available to the court: 'When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.' This conclusion is also recognized in *Marshall* itself, where the court stated that although the statutory time limit was not 'jurisdictional,' the court 'should consider rights of all parties affected,'" et cetera, et cetera.

```
 1          So at this point in time with deadlines having passed
 2  and there being duties the Government contends on the employer
 3  to test the market, but the Department of Labor has not told
 4  the employer what market test to run, how to advertise, where
 5  to advertise, the usual matters that go along with testing the
 6  market, what harm is there in ordering the Department of Labor
 7  to issue those certificates?  Not the final certificate, but
 8  the one --
 9          MR. FORNEY:  The notices of acceptance.
10          THE COURT:  The notices of acceptance so they can get
11  started testing the market.
12          MR. FORNEY:  Oh, that may be an interesting academic
13  point, but I think if you look at their chart -- and I
14  apologize for my error.  But in scanning their chart, I think
15  in the vast majority of the cases that's already been done, and
16  probably it's been done even more so today as time is passing.
17          THE COURT:  So for the ones that it hasn't been done.
18          MR. FORNEY:  But the ones that haven't been done, we
19  also have the other issue that the employers themselves have
20  actually chosen in particular cases other administrative
21  remedies.  They've appealed to the BALCA, which raises the
22  point of whether this agent actually speaks for the employers.
23  The Government has actually raised a standing issue, and I can
24  discuss that later, but that's a particular point here where
25  we're not even sure -- you know, the agent presumes to speak
```

1  for the employer, but the employer has actually gone off and

2  filed an administrative appeal.  They've actually chosen

3  another type of remedy.  So --

4          THE COURT:  So let's pick a case where the time has

5  run, and no notice of acceptance has been issued, and there's

6  no civil action being -- or administrative action being

7  pursued.  If there are any of those in the H-2A context, then

8  what's the problem with ordering the Department of Labor to

9  issue the notices of acceptance so they can at least advertise?

10         MR. FORNEY:  In principle, we have a particular

11  problem that we're not sure that this agent speaks for these

12  employers.

13         THE COURT:  Maybe, but there's nothing in the

14  statutory scheme -- or nothing that's been addressed that says

15  you can delay this while you make these determinations.

16         MR. FORNEY:  Well, that's actually -- but there's

17  nothing that says we can't, and the text instruction --

18         THE COURT:  The problem is, agency's authority is

19  specifically granted, and here there are statutory rules, and

20  there are agency rules, all of which require a certain scheme.

21  You say, well, you can't order the granting of the certificates

22  because that's a jurisdictional matter and to do that would

23  impermissibly intrude on the jurisdiction.  Fine.  Test the

24  markets.  But get the employers their notices of acceptance so

25  they can test the markets.  What's wrong with that?  That's the

1  mandatory part.

2        MR. FORNEY:  Because we don't even know if these

3  employers authorized this, frankly.  We just don't know that.

4  We need to confirm that.  The statute says that the employers

5  are the ones who are supposed to seek a petition and to test

6  the labor market.  If the agent is actually defalcating, how

7  can we know that, in fact, the statutory -- what Congress

8  wanted is actually being fulfilled?  We just don't know that.

9        THE COURT:  Ms. Pointer up here described the fact

10  that if you have problems about it, there are methodologies

11  within the regulations that would permit you to refer the

12  matter or do whatever you need to with respect to the agent.

13  So if you have concerns, then send the referrals and address

14  the problems with the agent.

15        MR. FORNEY:  There are solutions under the

16  regulation, but they're post certification solutions.  But

17  nothing forecloses the agency from assuring itself up front

18  that an actual employer needs a particular number of workers

19  for a geographic area and intends to hire those workers.

20        THE COURT:  What regulation allows you to delay the

21  process to make that determination?

22        MR. FORNEY:  The structure of the statute does.

23        THE COURT:  Fine.  What statute and what regulation?

24        MR. FORNEY:  That the employer must seek the

25  petition, and the employer must delay the foreign workers.  If

```
 1  the employer isn't even in the equation, then it completely
 2  undercuts the entire statute.
 3          THE COURT:  You're not saying that the employer
 4  hadn't signed the forms or the agent hasn't signed the forms.
 5          MR. FORNEY:  We don't know that.
 6          THE COURT:  You don't know whether they have or they
 7  haven't.
 8          MR. FORNEY:  Right.
 9          THE COURT:  Right?
10          MR. FORNEY:  We do not.
11          THE COURT:  But you've got papers that appear to be
12  in order that have been submitted by the authorized agent of
13  the employer and the employer.  So, fine, do your
14  investigation, whatever it takes.  But in the meantime, what
15  regulation would permit the Department of Labor to withhold the
16  notice of acceptance to permit the process to continue in a
17  timely fashion?
18          MR. FORNEY:  The regulation which requires an
19  employer to seek the petition.  If there's no employer in the
20  equation, then the entire process isn't even triggered.  It's a
21  predicate finding that actually has to be made by the agency to
22  even trigger this process.
23          THE COURT:  Did they send a notice of deficiency
24  within the appropriate time --
25          MR. FORNEY:  No.
```

 1          THE COURT:  -- making an allegation that this is

 2   improper?

 3          MR. FORNEY:  They sent a notice of deficiency, but

 4   not within the time frame contemplated by the statute.

 5          THE COURT:  On the cases where the notice of

 6   deficiency was sent, was it responded to?

 7          MR. FORNEY:  In all cases, I'm not sure.  There's so

 8   many competing charts here, Your Honor, I really don't know in

 9   all particular cases.  But --

10          THE COURT:  In the cases where the notice of

11   deficiency was responded to, in all those cases, did the

12   Department of Labor then proceed to issue the notice of

13   acceptance that would have allowed the employer to continue

14   with the appropriate testing of the labor market in a timely

15   fashion?

16          MR. FORNEY:  I only know of one case where an

17   employer provided an equivocal response which needed further

18   investigation.

19          THE COURT:  All right.  So in all other cases, the

20   notices of deficiency were replied to.

21          MR. FORNEY:  Right.

22          THE COURT:  And in all other cases, did the

23   Department of Labor then issue its notice of acceptance in a

24   time fashion?

25          MR.  FORNEY:  In a timely fashion?

1             THE COURT:  Yes.

2             MR. FORNEY:  In other words, in compliance with the

3    statutory time frame?

4             THE COURT:  Yes.

5             MR. FORNEY:  But the notice of deficiency in many

6    cases were sent after the time frame ran, I believe.

7             THE COURT:  All right.  Then once the notices of

8    deficiency were responded to, did the Department of Labor issue

9    then the notices of acceptance as --

10            MR. FORNEY:  In all cases that I know of, yes.

11            THE COURT:  All right.  We'll look at that on the

12   fact side.  So at this point in time in all cases where the

13   notice of acceptance was issued -- all right.  Let's take M & H

14   Tobacco Farms is the one that you say is proceeding

15   administratively?

16            MR. FORNEY:  Yes.

17            MS. POINTER:  Your Honor, I might speak to that.

18            THE COURT:  I'll hear from you in rebuttal,

19   Ms. Pointer.

20            All right.  Let's take a look at Cooper Creek Farm

21   Association on page 7 of 8.  Let's see when they submitted

22   their application.

23            MR. FORNEY:  Cooper Creek Farm has a notice of

24   acceptance dated April 2 as far as I understand from the

25   Department.

 1          THE COURT:  So they are one of the ones that have now

 2   received their notice of acceptance?

 3          MR. FORNEY:  That's my understanding, Your Honor.  I

 4   mean, I have not seen a piece of paper, but this was

 5   information that I received from the client this morning.

 6          THE COURT:  Who is left?

 7          MR. FORNEY:  I wish I could say, Your Honor.  I don't

 8   have -- the empirical facts seem to outstrip these charts, so

 9   I'm not even sure as of today where we are with all of these

10   employers.  My understanding is that the vast majority have --

11   if not received certification, they've already received notices

12   of acceptance, but I don't have a particular number for you.

13          THE COURT:  What about Carolina Farms & Harvesting on

14   page 1?

15          MR. FORNEY:  That is -- this morning I received

16   information from the client that the -- this was the case where

17   there was an equivocal response to the employer questionnaire,

18   which was further investigated.  That's been resolved.  I

19   believe the notice of acceptance was issued this morning.

20          THE COURT:  All right.  Let's look at HJT Packaging.

21          MR. FORNEY:  HJT Packaging on page 2, I believe, has

22   been certified.

23          THE COURT:  WW Farms, did I ask you about that one?

24          MR. FORNEY:  That appears, at least according to the

25   plaintiff's representation, the notice of acceptance issued on

1  3/31.

2          THE COURT:  What's left for us to hear in this case?

3  Have a seat, Mr. Forney.  Let me talk to the plaintiff.

4          MS. POINTER:  Your Honor, I have several things to

5  say.  First of all --

6          THE COURT:  I don't want to hear any argument.  I

7  want to hear what clients are left that haven't received their

8  paperwork?

9          MS. POINTER:  I can't say that as of today because it

10 is a rolling chart.  The applications go in 45 days in advance

11 of need.  The responses don't come within 7 days.  We chase to

12 determine whether or not a notice of deficiency with this

13 questionnaire that we are asking you to say that they can't use

14 for the interim time until there's a decision on the merit.  We

15 don't know whether this chart or this questionnaire has gone to

16 us or to the client or where to the client it has gone, if it

17 has gone.

18          Now, Mr. Forney mentioned MH Growers.  The reason

19 that a notice of administrative appeal was filed is that ILMC

20 is its agent; and when the Department of Labor said you didn't

21 answer the questionnaire in time, your application is dead, we

22 won't revive it, there's a question of, well, what do you do?

23 And the normal route is you appeal, and ILMC made the appeal

24 Wednesday, Thursday, or Friday of last week on that case, and

25 I'm glad Mr. Forney says it can be resurrected.  I don't

1  remember the details on what exactly happened with that.  I
2  believe that the farmer thought his daughter-in-law had faxed
3  the response back to Chicago from her place of work.  My memory
4  is that we were told that Chicago couldn't find it, but then,
5  again, they had told Senator Graham that they couldn't find a
6  recruitment report somebody else sent in.
7          THE COURT:  That may be, Ms. Pointer, but I'm not
8  going to enter just a general order telling the Department of
9  Labor to do everything this particular way.  There have to be
10 issues that are ripe for adjudication before I can enter an
11 order.  Right now in looking at this, it looks like the bulk of
12 these now, based on the updated information, have either
13 received their acceptance and are running their advertisements
14 as required, and they're waiting on that testing -- or that
15 advertising period to end, or they've received their
16 certificate.  And it may be it wasn't timely, I understand
17 that, but that's not -- that's not an injunctive relief issue.
18          MS. POINTER:  Well, it is in this respect, Your
19 Honor.  I don't -- understand that as we're trying to update
20 our chart, more people are rolling in to trouble, rolling in to
21 their dates not being --
22          THE COURT:  Maybe, but you're asking for prospective
23 relief as to person or persons unknown in those circumstances,
24 and that's not a matter that's been addressed at this point in
25 time.

1          MS. POINTER:  Well, what has been addressed is

2    that -- by the way, I'd like to go back to the *Brock v. Pierce*

3    *County* right now.

4          THE COURT:  Right now I just want to sort through

5    what's ripe and hasn't been rendered moot.

6          MS. POINTER:  All right.

7          THE COURT:  It sounds like the answer to the question

8    is there may very well have been additional matters issue -- or

9    documents issued by the Department of Labor.  We don't know

10   what stands where at this point.

11         MS. POINTER:  They are still issuing them.  That

12   questionnaire is still going out to people who don't have fax

13   machines, don't have emails necessarily, don't necessarily

14   operate at that particular location during this season of the

15   year because they're expecting ILMC to be the point of contact

16   and to address matters with the Department of Labor for them as

17   it did for the appeal in the MH case.

18         And so we need the Department of Labor to be directed

19   to respond within 7 days.

20         We need the Department of Labor to be directed to

21   discontinue this unauthorized questionnaire that is not

22   contemplated in the regulations.

23         We need the Department of Labor to be directed to

24   find expeditiously the certification dates 30 days in advance

25   of the date of need.

 1        We also have the chaos that when a company in South

 2   Carolina, and I can't tell you who it was, sent in its

 3   recruitment report the day it was asked for, days later after

 4   working through ILMC and Senator Graham's office to find out

 5   why it could not get its certification was told by Senator

 6   Graham's office "But they say you never filed the recruitment

 7   report," to which ILMC sent to Senator Graham's office that it

 8   had been sent in to Chicago showing it had been sent on the

 9   17th of March, and I'll tell you it comes to my mind that it

10   was the 24th of March when we finally got it straightened out

11   through Senator Graham's office before we actually got it.

12        THE COURT:  That may be.  An individual hardship in

13   these cases ultimately may be problematic, but in terms of

14   preliminary injunctive relief, as I understood it, we were

15   talking about issuing -- I know there was some discrepancy, but

16   issuing an order requiring the Department of Labor to issue

17   these various certifications because there were a number of

18   cases, at least as of the time the complaint was filed and then

19   subsequently, where they weren't getting the notice of

20   acceptance, they couldn't do the advertising, and they weren't

21   getting their certifications on time.  It may be ultimately

22   that there's some final relief; but in terms of preliminary

23   injunctive relief at this point in time, I'm not sure who has

24   got a live claim left for me to address.

25        MS. POINTER:  ILMC does in that it is still

1 experiencing these questionnaires that are being sent to its

2 clients because Mr. Forney and his client say we don't know for

3 sure, despite the certified original signatures, which, of

4 course, would be fraudulently presented to the Government if

5 they weren't real, are real. There is a process by which the

6 Department of Labor can determine after certification in this

7 15-day window -- it's got to make all of its determinations

8 whether we are lying, but we are not.

9         And so we ask the Court to insist that the Department

10 of Labor follow the statutory deadline of responding within 7

11 days. We ask that the Court enter the order that is consistent

12 with 35 years in my experience, maybe a little bit more than

13 that, practice of the Government, the Department of Labor,

14 dealing with the announced agent so that the farmers who are

15 out in the field from early in the morning before daybreak and

16 tired and maybe don't even have the facilities can be contacted

17 by ILMC to deal with the details of dealing with the Department

18 of Labor. This is going to kill us this spring and our farmer

19 clients because if the Department of Labor keeps on sending

20 these notices of questionnaire to confirm after getting -- they

21 said they had one that was questionable --

22         THE COURT: All right. Let me -- you've answered my

23 question. At this point in time we don't know who's left who

24 hasn't been -- either received their notice of acceptance or

25 received their certification, one or the other.

1    MS. POINTER:  I cannot tell you that, but I can tell
2 you that there are plenty who are still overdue, and there are
3 reasons they're overdue.  These folks are trying to do stuff
4 that they are not authorized to do, and so they're getting --
5    THE COURT:  Well, they may be overdue, but the ones
6 on your list are going through the RR process at this point.
7    MS. POINTER:  Well, Your Honor, if you get workers 30
8 days after you need them to be planting or plowing the field or
9 putting manure in the field so you can later at the right time
10 plant corn, you are not being helped, and that's is where we
11 are.  We are still behind the eight ball in terms of timing
12 because the Department of Labor is sending out these
13 questionnaires that are taking more time.  Then they're losing
14 them --
15    THE COURT:  I understand that, but the more I pull --
16 in terms of not doing anything, that's one thing.  But in terms
17 of a Court enjoining an ongoing process, even though late in
18 granting the certifications, it seems to me at that point I am
19 removing jurisdiction from the Department of Labor and
20 compelling them to make a finding without the process having
21 been completed.  That's the discretionary part of the process
22 that I asked you about earlier.
23    MS. POINTER:  I don't think it's a discretionary
24 part.  Mr. Forney says that we might have to send foreign
25 workers home if all of a sudden there were US workers willing

1  to do a job.  I've actually been involved in having to do that

2  because Puerto Rican workers, who are, of course, US citizens,

3  took jobs in Florida, and that's exactly what happens.  If we

4  should be so fortunate to have US workers who really want these

5  jobs, that is exactly what is done.  That's in the papers that

6  are filed to bring in the Mexican workers.  There will be

7  people properly recruited --

8       THE COURT:  We're getting into rebuttal now.  Let

9  me -- you've answered my question.  Let me hear from Mr. Forney

10 because I have a couple of more questions for him.

11      MR. FORNEY:  Your Honor, I did want to correct a

12 point in the Government's brief, and I do apologize because of

13 the hurried nature of filing the pleading.  I wasn't able to

14 address the status quo issue in as much detail as I would have

15 liked to, but I would like to bring to the attention of the

16 Court some case law in this jurisdiction which does authorize a

17 Court to enter a mandatory injunction in very rare

18 circumstances that would alter the status quo.  That's first

19 discussed in *Wetzel*.  That's 635 F.2d 283.  But the case

20 indicated the narrow grounds that -- the narrow test upon which

21 the Court should rest this extraordinary relief.  It would be

22 necessary to prevent irreparable harm and a deteriorating

23 circumstance created by the defendant.

24      But I think as Your Honor has put your finger on the

25 point, regardless of what may have happened over the last

couple months, we don't any longer have a deteriorating

circumstance in the situation where we've got certifications

issued, and we have notices of acceptance already issued.

THE COURT: Well, let me talk about the point that

Ms. Pointer raised, and I have mixed feelings about it. As a

practical matter, I understand it completely, but as a legal

matter, I don't see that the regulations permit it, and that is

this sending questionnaires directly to the employer. When I

say as a practical matter I understand it, if there's

individuals in ILMC who have been indicted and all kinds of

misconduct alleged, I can understand the concern or uncertainty

about dealing with ILMC. So I'm not saying that concerns that

the DOL may have aren't reasonable.

On the other hand, the agency has the power that it

has, and I don't see anywhere that they've got the power to

skip -- to go behind the agent and start submitting or

requesting additional information directly from the employer

under the agency relationship.

So, you know, as I said going forward, I hesitate to

enter an injunction, but the agency's either got to go down the

road of having ILMC disbarred if they want to or comply with

the rules if they want to, but that needs to -- it seems to me

that needs to stop. Maybe you disagree.

MR. FORNEY: Well, I understand Your Honor's concern,

but I think that there's two points that are at issue in your

question, and perhaps one of them is a suppressed issue because
it wasn't clearly brought out in the plaintiff's brief, but
it's the Paperwork Reduction Act issue.  I know maybe you're
speaking to a more specific point, but I just want to address
that issue very briefly.  The Paperwork Reduction Act claim
that they raise is that any paperwork that goes to a regulated
entity must first receive an OMB clearance number.  The actual
statute provides for an exemption from that, 44 USC
3518(c)(1)(B) --

THE COURT:  Let's not go down that road.  It's a
simple issue.  Department of Labor allows for agents to appear.
Paperwork has been submitted through the agents.  There's good
basis to be concerned about what the agents have submitted.  I
understand that.  But on the other hand, the regulations pretty
clearly delineate what needs to be submitted in connection with
the application and the notice of deficiency, and there's
really no allowance for going around and going directly to an
employer who has an agent without going through the agent at
the same time.

So I understand why.  But on the other hand, that
does then become problematic because, A, it's not -- I don't
see that it's permitted under the regulations; and, B, you've
got the Government out conducting its investigation.  Either
send them in for debarment, or just go through the process as
laid out.  Is there a big issue with stopping that at this

1  point?

2          MR. FORNEY:  Well --

3          THE COURT:  Not in terms of an injunction.  I'm just

4  saying if I ask you to stop it, will you get the Department of

5  Labor to quit doing that for the time being?

6          MR. FORNEY:  Is this a friendly request from the

7  Court?

8          THE COURT:  A friendly request from the Court for

9  right now.

10          MR. FORNEY:  Well, we don't even know if this will

11  happen next season.  I mean, there's many things that could

12  happen.  The ILMC could be acquitted.  The Department of Labor

13  could have satisfied itself this season and, in fact, that what

14  ILMC is doing is aboveboard and that the employers did

15  authorize this agent to act on their behalf.  So this is all an

16  academic question and a moot question at this point because we

17  just don't even know that that would even happen next season.

18          THE COURT:  The only question is, is there any way to

19  stop the Department of Labor from sending questionnaires

20  directly to the employer having received the original

21  application from the agent?  That's not -- as I read the

22  regs -- I may be reading them wrong.  I don't see anything that

23  allows that.  The regulations allow for the appointment of an

24  agent, allow for the submission of materials by the agent, and

25  at least in my mind seems to suggest that the notice of

1  deficiency goes back through the same channels.

2          Here you've got stuff going to, you know, wrong

3  addresses.  That kind of thing is going to happen, but this

4  business of sending stuff around behind the agent, no matter

5  how practical it may seem, doesn't seem to me to be allowed by

6  practice or regs.

7          MR. FORNEY:  Well, I don't want to concede that

8  point, but at the risk of trying Your Honor's patience, I don't

9  even know that the Court can even get to that issue because I

10  don't think the agents even have standing.

11          THE COURT:  What they want me to do -- okay.  I

12  understand your standing arguments.  To cut this a little bit

13  maybe short, *Lexmark* is pretty convincing to me in terms of

14  broad standing in the APA context.  I understand you disagree.

15          But the bottom line is they're asking me to issue an

16  injunction saying tell the Department of Labor to comply with

17  the regulations, timeliness, everything else.  Without a live

18  case, in other words, no injured -- no parties who are

19  presently suffering harm because they've been caught up within

20  the system, that really only leaves one issue, and that is the

21  business of going around and sending stuff directly to

22  employers who are represented by an agent before the Department

23  of Labor, and I don't see that the regulations allow for that.

24          Now, maybe they do, and you've got a regulation you

25  can point me to.  But the regulations and the statute are

1  pretty clear about this notice of acceptance, notice of

2  deficiency, what you can and can't ask for and require in that

3  part of the process; and this business of coming up with

4  another form and sending it directly to the employer, no matter

5  how laudable may be the reasoning for it, that's an

6  investigation that goes beyond what's contemplated by this

7  application process.  If there's anything here for me to enjoin

8  at this point, that's it.

9           But it seems to me the Department of Labor ought to

10 be willing to make a commitment that just says, look, we'll

11 follow the statutory guideline in terms of forms, notices of

12 deficiency, and everything else while this case -- until this

13 case is resolved.

14         MR. FORNEY:  Well, I --

15         THE COURT:  I'm not asking 7 days, 30 days, none of

16 that.

17         MR. FORNEY:  Right, but -- I mean, I could call, and

18 this goes back from -- I hate to speak anecdotally, but I

19 recall a case from law school called *Lyons* where, you know, the

20 Supreme Court -- it was a chokehold case, and the Supreme Court

21 said, well, you can't enter an injunction for an event that may

22 happen in the future.  You can't compel an agency or a state

23 component to comply with the law in the future.

24         THE COURT:  Prospective relief is not always

25 appropriate, having been briefed in this case, but there does

1 appear to be some evidence that they have been doing this as

2 they go along. If you want to debar ILMC, debar them. If you

3 don't want to debar them, if you want to wait the criminal

4 process out, then continue with the process as it's --

5          MR. FORNEY: But doesn't it come down to the

6 fundamental point that they appear at this point to have not

7 identified a single employer which is now caught up in this

8 process? I understand the time has passed, but they've

9 received certification, and they've received notices of

10 acceptance. I don't know if there is a particular employer who

11 hasn't received a notice of acceptance yet. It's doubtful.

12 There may be one, and maybe tomorrow that person receives a

13 notice of acceptance. It just seems as though there's nothing

14 ripe for this Court to decide anymore. It's all become moot.

15          THE COURT: So your argument on mootness would also

16 extend to the form. If the form went out, was filled in, sent

17 back by the employer, maybe we shouldn't have done it, but it's

18 moot at this point.

19          MR. FORNEY: Right. So what we're talking about is

20 relief that's wholly prospective, what may or may not happen

21 next season with these employers. I mean, they're engaged in

22 seasonal employment, so we're talking about something that's

23 going to happen next year. Department of Labor may not even

24 send out this form next year. Or if they do send out the form,

25 they may meet the statutory time limit. It's unclear, but

1    that's all speculative.

2          THE COURT:  All right.

3          MR. FORNEY:  But at least at the preliminary

4    injunctive stage, it's just not appropriate for the Court to be

5    entering extraordinary relief like that.  We may brief it on

6    summary judgment if the Court finds that there's still relief

7    to be granted for an order compelling the agency to act one way

8    or the other in compliance with the statute.  Maybe that's

9    appropriate at a later time, but certainly not now.

10          THE COURT:  All right.  Ms. Pointer, I'll give you a

11   couple of minutes in rebuttal.

12          MS. POINTER:  I do have a few things to say.

13          We count 84 employers so far on whose behalf ILMC has

14   submitted applications this year.  It represents over 200.

15   From what I've seen of the applications, we're going to have

16   maybe another 100, maybe another 100 and a quarter, because

17   most farmers, even those who are not right in this part of the

18   country, are going to bring in a smaller crew to prepare the

19   fields and do the planting, and then there's going to be

20   another job order filed 45 days before the date of need in

21   July, or maybe they bring them in in June depending on what

22   their particular crop is.  So we're still in the middle of the

23   mess.

24          One thing that's really interesting that Mr. Forney

25   admits is that of all the applications that he's sent out, you

1  know, questionnaires his agency has sent out, and they still

2  want to be able to send out, they had one fellow who said --

3  well, it's kind of a complicated story about how he decided he

4  was going to bring in just two crews this year instead of

5  three, and he was thinking -- he was talking about what he was

6  thinking back in September as opposed to what he was thinking

7  by November.  Another instance that he admitted in the

8  materials that he submitted is -- gosh, I just lost my train of

9  thought.

10         But the main point is, we don't have a crisis that's

11  going to be out next year, we have a crisis that's rolling

12  along as soon as they send out another application for another

13  person.  I'm happy to stay here tonight.  I'm going back to the

14  office.  I bet you we've got applications right now that are

15  delayed over the 7 days.  We don't know why.  I bet you we're

16  going to find out that somebody says they've sent a notice of

17  deficiency somewhere that may or may not be lost, may or may

18  not be under the bushes in somebody's backyard.

19         We cannot wait until this is all resolved to ask the

20  Court to give this client what it is entitled to have, which is

21  due respect, due process, and compliance by the Department of

22  Labor with the statutory requirements and with the regulations

23  that it published with notice and comment and all of that

24  saying this is how we're going to process these applications,

25  and this is all the paper you've got to submit.

1    I just ask Your Honor to issue the order that we sent

2  and filed last week requiring the Department of Labor to follow

3  the 7-day deadline, requiring the Department of Labor to send

4  out one notice of deficiency, requiring the Department of Labor

5  to stop sending out notices of deficiency over issues -- the

6  same company that I said that won the case in April of 2011 got

7  another dose of deficiency this year because it said we'll pay

8  whatever is the subsistence rate that is in effect at the time.

9    We get notices of deficiency that just look on their

10 face like somebody is trying to say something to have a reason

11 to send a notice of deficiency and that questionnaire directly

12 to the employer.  I can't tell you how many notices of

13 deficiency I've seen where Department of Labor is saying you

14 forgot to put the maximum lifting limit on the 9142, and it's

15 on the 790, and the ILMC looks at the two pages and say look at

16 F-3 on the page you said that's missing.  It's just as though

17 people are trying to make up reasons to have a reason to

18 contact the client directly and not even tell ILMC, which is

19 the lawful agent, until and unless it is found to have acted

20 incorrectly.

21    So I would ask that the requirement be further in the

22 order that the Department of Labor issue any notices of

23 deficiency or notices of acceptance in a means -- if they're

24 not going to use next-day delivery -- and I think that's

25 regulatory.  I don't think it's in the 1188.  I know it has to

 1  be in writing in 1188.  It's definitely in the regulations, and
 2  it's got to be next-day delivery.  If they are not going to
 3  send it in such a means that we can know that it's there and
 4  know to whom it was sent, then send it to us overnight because
 5  we are being told days later that they were sent days later
 6  only to find out that possibly the email address was wrong or
 7  maybe they say they sent it by UPS, and it doesn't have a
 8  tracking number that UPS or we can track down.

 9       So I'm asking Your Honor to enter the order that we
10  ask on the proposed temporary restraining order and -- actually
11  issue a preliminary injunction to add to it that to the extent
12  there are certifications that are due now that we get those
13  certifications.  Mr. Forney --

14       THE COURT:  If there are no certifications due at
15  this point, there are none due, then there's no controversy?

16       MS. POINTER:  I cannot say there are none due.  I
17  will let the Court and Mr. Forney know by 10:00 tomorrow
18  morning if there are any that are due today or tomorrow.

19       THE COURT:  Or tomorrow or this week.  I mean, I
20  don't know how -- I understand the frustration with the
21  Department of Labor.  I look at this, and I see the delays, and
22  I understand those delays really shouldn't be happening because
23  if we get into that less than 30 days, then -- or if we wait
24  too long, the farmers -- they don't have anything, can't
25  harvest crops.  I understand the economics of it.  I've got

that part.  But ultimately there has to be a live case or
controversy.  Now, it may be that it happens -- it's a *Roe v.*
*Wade* standing question in that everything happens before a
Court can issue an order, and, therefore, you've got a
different scenario.  Maybe that's the kind of thing.

          MS. POINTER:  And I think we --

          THE COURT:  But that hasn't been briefed or argued at
this point, and I'm not going to rule on that basis.

          Number two, it may be that there are others out there
who are now in the middle of a live case or live controversy,
but I'm not going to speculate as to whether there may or may
not be because I just -- I don't know.

          So it seems to me at this point -- well, I don't mind
saying it directly, that I don't -- on this evidence, it's
impossible -- I understand I took some evidence from Mr. Forney
by way of his representation, but either the certificate's been
issued or it hadn't; and if the certificate really has been
issued, then any injunctive relief as to that particular
employer and this particular agent would be moot among the
furnishing of that.

          So what I'm going to do is I'm simply going to take
this matter under advisement at this point, I'm not going to
issue an order today, and I'm going to give you -- I mean, you
want to have it to me tomorrow morning as 10:00.  I'm going
to -- I'm going to say we will spend -- we'll work on this some

this week.  We've been working on it, but until something is

presented that shows me there's either evidence of an actual

case or controversy that can be resolved by way of a temporary

restraining order or an injunction or that the way things are

occurring makes it impossible for the case to be reached before

the damage occurs, but the case is over before it can be

reached in the normal course of litigation, under those

circumstances that issue would have to be briefed separately

since it hasn't been addressed.  But at this point in time, I

can't tell who's still got a problem and who doesn't have a

problem.

        MS. POINTER:  May I just address one issue relating

to the status quo, Your Honor?

        It seems to me that the *University of Texas* case

that's -- *Camenisch* that we've all briefed that I can't

pronounce -- gives us clear guidance on why the Court ought to

consider that the status quo is putting things back the way

they were with respect to the questionnaire.  In the Texas

case, you'll recall, the Court concluded that grievous damage

would be done to a deaf person if the university were not

required to provide a sign language interpreter, and so on the

posting of bond, the university was -- by the student -- the

university was ordered to provide the interpreter, and the

Fifth Circuit upheld that, and, of course, the Supreme Court

talked about other issues, although by the time the case

reached the Supreme Court, that issue was moot also, of course.

That's just the nature of things that are moving fast. We have offered to do everything we can in our power to make sure that no US worker who wants a job is thwarted from any job. That person can go to work immediately and have rights that are superior to any foreign worker who gets here a month from now, even if we must send those foreign workers home. That's just the way the system works, and we'll do the recruitment and so forth.

But I appreciate your time. I'm going to go back and try to figure out who is still hurting because the certifications have not been granted, and I'm going to ask Your Honor to think further about the disruption that's going to be caused, worse now than it was in February and March when farmers are not able to get out all day long and can be reached at home at night when they're not dog tired.

If these questionnaires continue to go out, despite the 80-some or how ever many have gone out with everybody coming back and saying, yes, this is my agent, and, yes, this is my order, I stand by what I signed and what was already been submitted on my behalf, I'm going to ask you again to tell the Department of Labor it may not issue that questionnaire any longer until it does a valid rulemaking or other action that justifies the use.

Thank you so much for your time, Your Honor.

1           THE COURT:  All right.  Thank you.  I'll take this

2    matter under advisement.  We have one more hearing today.

3    We'll be at ease for five minutes, and I'll speak to counsel.

4           (At 4:55 p.m., proceedings concluded.)

5                        *  *  *  *  *

6                  C E R T I F I C A T E

7       I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

8

9

10   Date: 04/18/2014    Joseph B. Armstrong, RMR, FCRR
                          United States Court Reporter
11                        324 W. Market Street
                          Greensboro, NC  27401

12

13

14

15

16

17

18

19

20

21

22

23

24

25